Good morning, everyone, and welcome to the Ninth Circuit. Judge Christa and I are happy to welcome Judge Liberutti, a District Judge from Arizona, who is helping us today. We'll take the case. It's in the order of the day sheet. The first case for argument is United National Insurance Company v. L.A. Terminals, Inc. Good morning, Your Honors. I'm James Nielsen, Counsel to the Appellate, United National Insurance Company. I'd like to reserve five minutes for rebuttal, please. Please watch the clock. Beg your pardon? Please watch the clock. Very good, Your Honor. Thank you. Your Honor, in the few minutes we have, the prevalence before this Court today, I'm going to try to address three basic issues as briefly as I can, those being, first, the ruling on United National's duty to defend the City's first amended complaint against the Appellee, L.A. Terminals. Secondly, the issue of the right to independent counsel, which the trial judge also adjudicated. And if we have time, I'll try and touch on the issue of mitigation. I'll leave the issue of jury trial to be submitted on the briefs, absent questions from the panel. What about the jurisdictional issue? Is that something we should be concerned about? Well, it's certainly within the Court's purview to rule on the jurisdictional issue. The motions panel denied the motion to remand. This Court could revisit it. I don't think that's necessary. But, yes, the Court could address it. I assume the Court's referring to the Rule 59 motions that had been pending before the district judge. It was a funny sequence of events. Both sides filed Rule 59 motions. Our side also filed a Rule 62 motion before the district judge ruled on that. A bankruptcy was declared by the plaintiff. The district judge, incorrectly, issued an order on his own, stalling the proceedings in light of the bankruptcy proceeding. In the meantime, and denying the pending motions as moot. But is it your position now that I'm conscious of your time. Sure. Is it your position that we don't have a final judgment? No, it's our position you do have a final judgment, Your Honor. I just want to be clear. Yes. Because that sequence is laid out, so is there any more you wanted to add to that? No, Your Honor. I think we briefed it adequately in our response to the motion. I think the only real question was whether the ruling by the district judge, even if it was not on the merits disposed of the motions, we were only able to find one case nationally that was out of the Fifth Circuit, which said, doesn't matter, could be on the merits, could be procedural, could be claiming they're moot, as long as they're disposed of, those motions are disposed of. I should add, the court should be aware, it's not, I don't think it's in this record, but in denying the motion, the merits panel, pardon me, the motions panel, invited the district judge, if he wanted to, to revisit those motions and indicate whether he wanted to make an indicative ruling. He declined that opportunity. He expressly declined it.  So you don't have anything other than the briefing? You lead to the sequence, but you've briefed that and you're good with the briefing? Yes. Okay. I misunderstood you. Okay. Yeah. So then let me turn to that first substantive issue, which is the, essentially the burden of proving the potential for liability to satisfy us with an accidental exclusive exception to a pollution exclusion. You know, this circuit in the Zurich versus Ironshore case predicted that California would put that burden, even in the context of the duty to defend, on the policyholder to establish a duty to defend. That was in the context, interestingly, of a referral to the Nevada Supreme Court because of a couple of district court decisions that had been issued by two district judges, I think both in Las Vegas, Judge Dorsey and a district judge, Navarro. And what struck me in going through the papers was the similarity, just a comment further on the Zurich case, this circuit, including Judge Okuda, referred that matter to the Nevada Supreme Court. They did, in Nevada, reach the same conclusion that this court predicted California would find, and that was the burden was placed directly on the policyholder to establish the exception to the exclusion. The cases cited by your opposing counsel of the anti-traveler companies and the age pleading seem to say that so long as the evidence eliminates the possibility that the, is there an accidental, then there's a duty to defend. What's your response to that? That is the whiskey and highball, Your Honor. That's the question. The Van case was fairly early on. I think it was simply incorrect. And I'll say that bluntly. No cases followed the Van case. The age pleading case, I think, creates an interesting sequence if you look at it. I think you need to look carefully at the facts in the age pleading and its recognition of the point that the appellate here has seized upon. That's us. In its footnote, I think, 23, embracing the reasoning of the Sacramento pleading case, we have two electoral pleading cases. I've had several electoral pleading cases, and those complaints were so very different because they allege the dipping and the moving of the ongoing day-to-day operation. So what about the allegations in this complaint, the First Amendment complaint, support your position? Let me suggest, Your Honor, there's a, let me draw back to those two pleading cases because they are informative of the allegations here. If you look at the allegations in age pleading where the California Court of Appeal found that a duty to defend existed and that a potential had been established, there was no evidence of an ongoing years-long pattern and practice of polluting. If you go through the facts, and it's important to carefully read these, in age pleading there were two witnesses. There was the owner of the business who said that there had been, I believe I counted them up, maybe seven instances where someone had briefly dropped a bucket and they quickly cleaned it up and they were scattered over the course of several years. And the insurer produced an additional witness who said there was also, pardon me, the policyholder produced an additional witness who said there was also a case where a trough had breached in the rear area and one other. So there was a series of less than ten events over the course of a dozen or 15 years that were specifically identified, the cleanups and everything and all of them involved, so that the policyholder could make a credible case that this was not just an ongoing, as they like to put it, they ran a clean shop and they had a couple of incidents, but they were not engaged in ongoing pollution. The distinction in Sacramento Pleading was the evidence was undisputed and the allegation was that for many years they routinely, as your owners pointed out, dipped, moved, whatever, they were constantly dripping all over the place into the floor and the fact that, importantly, District Judge Shub in the A.H. Pleading case said that the fact that there were a couple of specific incidents intermingled with those where they could identify that a particular hose had been cut and some stuff had been released into the, I think it was actually the city municipal sewage system, wasn't enough to get past it because they're already in the process of constantly polluting over time. That is identical, I should add, that's the portion of the reasoning that the A.H. Pleading Court dropped a footnote saying, well, of course, if you're in that situation, we agree. But if we're looking at the test of eliminate the possibility of a sudden exit or release, what eliminates that possibility in your view? Nothing eliminates the possibility. The question is who has the burden of establishing it in the first place. But if we agree with you that the plaintiff did, when we look at the First Amendment complaint, it is not as detailed as the other instances with the electroplating cases, to be sure. But it alleges, and I'm just really anxious to hear your response, right, but it alleges four different tenants over a very long period of time, decades, right, and handled, I think, 23 different toxic substances and spilled something like 19, sort of at the end, the way I read it is at the end of the day, the end of the period, of 19 different substances. And it also alleges that each tenant contributed to the soup. So why does that eliminate, to get to Judge Akuta's question, if you could, if you could, why does that eliminate the possibility that there was a sudden release on lats, during lats tenancy? The question, Your Honor, is not whether it eliminates the possibility in the abstract. Hypothetically, the question is whether the allegations in the First Amendment complaint by the city against L.A. Terminals created the possibility of those in the first instance. Your Honor has asked for citations on that, and I'd be happy to. No, no, no, I'm not. I'm accepting that standard. I'm trying to figure out why you think that the allegations, and maybe I'm not asking you very well, but I'm trying to figure out why the allegations in the First Amendment complaint don't do that. I think AIG, Access Carrier, thought they did. And I'm just trying to get, you don't get to be in the conference room with us. I'm trying to get your very best response to this question. It's hard to say. I don't know what AIG thought or what its rationale was. But I can say that what the First Amendment complaint alleged was, as you said, decades of ongoing, steady leaks, spills, and so forth. So it doesn't say steady, and it doesn't say day-to-day. I think the letter denying defense said that you interpret it as a day-to-day. But I don't think the complaint says, the First Amendment complaint says day-to-day. It does not use the words day-to-day. You're correct, Your Honor. All right, so what it tells us is, again, it's much more sparse, to be sure. But why isn't that enough? There were so many, all four tenants are alleged to have contributed 19 different types of substances. So we're envisioning, you know, premises were distributed where there's, I imagine, that there's been some kind of a survey. Why does that eliminate the possibility that there was a sudden release on Lat's watch? It doesn't eliminate the possibility. It simply doesn't imply the possibility. Okay. That's the point, Your Honor. So you're fighting with a standard, if I understand you correctly. You disagree with the standard that Van, each one of those companies, puts out. Oh, absolutely, Your Honor. Van is simply incorrect. No court has followed it, including this court. Okay. So, yeah, and along those lines, Your Honor, and I should add, in additional response to Judge Kristen's question, yes, it was several entities that polluted over many years. L.A. Terminals came on the site in 1981. But under the permit it signed, it took responsibility for all of the prior, all the way from Hooker, chemical to Oxidel, chemical to Ash Cross Heavens, it was right there in its permit to use the site. And it indemnified the city for whatever pollution was out there, as well as anything else, anything it did itself. So when we talk about a long, ongoing series of pollution, I don't see it. There's no real distinction between this case and, for example, Sacramento Plating. So, I know you want to get on to other issues. Can I just ask you one final question? You're saying long, you're saying day-to-day, ongoing, but, of course, sudden and accidental is a term of art, and we all know that. It refers to the commencement of a spill or a leak. Is it not possible on the first amendment complaint that all 19 spills happened suddenly during one of those tenancies? Nineteen spills? I'm not sure what the court is referring to. The complaint alleges that 19 different toxic substances were found. Oh, well, they were handling plenty of toxic substances. That doesn't particularly. I guess I think your answer was the one you gave to Judge Acuda, which is you think the standard is wrong. So maybe we could let it go. Right. And I'd refer the court back to the description of Judge Navarro's ruling that was eventually overturned in the. . . I mean, that was Nevada law, if I recall it correctly. It was Nevada law. Yeah, it is. But the court was addressing that ruling in the context of its prediction that the Nevada court would, or wondering whether the Nevada court would follow the majority rule around the country, as illustrated by California's rule, which the court described. And the ruling here and the standard applied by the district judge to that issue was virtually identical, as this court described Judge Navarro's ruling, absent evidence. And this is at page 809 of the Zurich case. Absent evidence that the alleged property damage was not sudden and accidental, the court concluded that Ironshore failed to carry its burden of showing that the exception to the exclusion did not apply. And so do you have a California case that says that? The MacMillan case is one that this court cited in Zurich, and it made the same prediction. That was one of the reasons this court. . . Was that a federal case? It's a state case. A state case. MacMillan versus, I apologize, I can't remember which one. But it's MacMillan, and it's also, the court also cited the late Walter Krosky's treatise, which also predicted the same thing about California law, which is what we had relied on as well in the course of these proceedings. On that standard, let me. . . This is a little frustrating, because actually the bigger money issue is the independent counsel issue, but. . . My question is on duty to defend. Okay. Well, then I'm going to. . . I will turn to the issue of the district court's ruling, first in declaratory judgment, and then part of a finding of breach that the tender of a defense by United National through Attorney John Bryden was inappropriate, because the court had two reasons. One, it was in Breach 1. Ma'am, your brief talks about this being improper, and you just used the word inappropriate. I'm just taking that, and I'm not trying to give you a hard time, but I'm taking this as your position. My understanding, correctly, is that by tendering, offering this lawyer your client's position is that they did perform and fulfilled their duty to defend. Is that right? Yes. As of April 19. . . That's not even disputed, Your Honor. I mean, that's a principle of law. Sir, I'm just trying to make sure that's what you mean when you say proper. Yes. Okay. Fulfilled your duty. That's what you're. . . That's what we mean, Your Honor. Okay. I'll get out of your way. Go right ahead. Right. So there were two grounds in which the district judge found that the offer of a defense was inadequately laid. One, I think the simpler one, is the Gilmas issue, the Civil Code Section 2860, which says that if a reservation of rights creates a conflict between the insurer and the insured, the insured has the opportunity to select independent counsel at the insurer's expense. There are lots of limitations to that rule, and the narrow issue that was reserved here was the suddenness of the alleged pollution. The insurer conceded the accidental nature. There were, as appellees have pointed out many times in their briefs, there were a couple of allegations that they were negligent in the course of polluting the harbor, and the California courts have acknowledged that negligence is sufficiently close to accidental to satisfy that, and so the insurer simply focused on the narrow issue of suddenness, which the courts in the Shell Oil v. Winterthur and other cases have found to refer to abrupt and immediate, and suggested that the insurer reserved only on the narrow issue of whether the pollution for which L.A. terminals was alleged to be liable had occurred abruptly and immediately. So that was the narrow issue, and the court had two basic rationales, both of which are embraced by the appellee. One is that the exclusion requires both, and that sudden is contemplates unexpected and accidental damage by itself, which is a position that was rejected long ago in the Shell Oil case. The two prongs of the exception to the exclusion are distinct. Each has a distinct meaning, and the California law is clear that the sudden aspect is temporal, has to do with the brevity of the release. It was also suggested that United National did not have the right to waive a reservation on an issue, and that's simply contrary to California law. The Swanson v. State Farm case, which we cited in the papers, expressly says that an insurer may do exactly that. I think their argument is that by reserving the right, United could, through its counsel, could limit L.A. terminals' recovery, because the counsel could build a case that it wasn't in fact sudden. I believe that's what their argument is, one of their arguments for why they need independent counsel. I'm sorry, could the court repeat the question? I'm not sure I caught it properly. The reason, as I understand it, opposing counsel says the registration of rights could cause a conflict of interest is because counsel could build a case that would show the pollution was not sudden. Except that's exactly the sort of argument the California courts have rejected, because the issue of whether the pollution was sudden or not sudden was not an issue in any of the underlying litigation. In order to create a conflict, the issue over which counsel has control has to be something that's actually litigated at issue in the underlying case. You just have a few seconds left. Do you want to keep it for rebuttal? I will, Your Honor. Thank you so much. Thank you. We'll hear from the other side. May it please the court to submit a decision for appellees. As this court has recognized numerous times, California law imposes an extraordinarily strong, broad duty to defend. Once an insurer attends a complaint, the insurer must defend the lawsuit if, quote, that raises the possibility that the insurer to be liable for losses covered by the policy or the complaint might be amended to give rise to liability that will be covered under the policy. That's her mantra. And as this court described it in Anthem Electronics, that means that the insurers are relieved of their duty to defend only if the complaint can, by no conceivable theory, raise a single issue which could bring it within the policy coverage. That is the element. Exactly. That's the element. Can you please go to the First Amendment complaint and tell us why you think it did that? Right. So, I mean, the complaint, I think as the questions have been underscored, is a broad allegation of, quote, negligent handling and storage. It alleges that LAT failed to clean up or leak spills and releases of hazardous substances. And if you look at, for example, 3EL413, you know, the allegation there is the marine chemical terminal storage facility. Terminals at the site involve transportation of certain hazardous materials that leaked from storage tanks, pipes spilled or were disposed of on the ground into the soil and seeped into the groundwater. I mean, a leak from a storage tank is the quintessential sudden and accidental release. And so it was, you know, the allegations in the complaint are absolutely consistent with the idea that some of this could have been sudden and accidental. And as Judge Christin, as you said, we're talking about a 10-year period between 1982 and 1992. There needs to just have been a single instance of a sudden and accidental release to create the possibility of coverage. And that's what the California Supreme Court said in bus that if, you know, it doesn't need to be all 19. It can be one of the 19 or it can be one instance of one of the 19 chemicals leaking. That makes it a mixed case. And in a mixed case, an insurer still has a duty to defend. The insurer is supposed to go in, defend, and then if it, you know, if at the end, if it finds out that, in fact, none of the pollution at all was sudden and accidental, then it has the right to file a recoupment action. And it can allocate any defense costs that it spent defending uncovered liability in that action. But what it cannot do is what it did in this situation, which is to say at the outset, try to have a fight about whether there's coverage. And this is the quote from bus. To defend immediately, it must defend entirely. It cannot pass the claims, dividing those that are at least potentially covered from those that are not. And the reason, of course, is in that situation, you would have collateral litigation all the time against your insurer at the outset. And counsel, pardon the interruption, but that's exactly what United did. It reserved its rights at the outset, correct? It denied, no. Well, at some point, it approved coverage but reserved rights. Isn't that right? It did that in April 2018, but it refused to provide independent counsel. Okay. Was it ever proven through discovery that there was or was not a sudden leak? So the underlying litigation was stayed because of the bankruptcy, and there's going to be a motion for summary judgment. So there's nothing in the record. There was discovery, but there's nothing in the record one way or another as to whether there was sudden accidents or leaks. I mean, I think it's completely consistent with the complaint, but the complaint for that was subsequently amended to even note that there were sudden and accidental releases. And, of course, the insurer here comes back in a year later and basically does effectively a mea culpa and says, we actually should have been defending it. It must have been possible because they agreed it was possible. They came in. You moved to that. We do have in the record that the underlying litigation has resolved, right? We do know that. No, it's still stayed. There is a settlement. There's a settlement in principle the bankruptcy court hasn't. We just have the indication of the settlement. Yeah, exactly. It's not resolved. To the opposing counsel's position that by offering to provide counsel, they satisfy their duty to defend. That would be a year, and I appreciate that, on April 19th. But that's his position that he satisfies. Correct. And the most straightforward grounds to resolve that is that what was happening there was they refused to provide independent counsel, even though they were insuring both the plaintiff and the defendant in the underlying suit. And there is no case in California law that has ever remotely suggested that it would be permissible to do that. Obviously, in the Amaro case, it says the guiding principles. You know, these rules derive from ethical rules, and the most fundamental ethical rule. Hans, if you could help us engage. You know his response to him. This is in the briefing. You know his response to this. He's talking about how that was in the old days before comparative negligence. So what is your response to that? Yeah, I mean, that's not at all correct. The question is whether or not there is a conflict that, you know, whether or not the deal sort of obligations that a counsel would have to both the insurer and to the client create a conflict. And I can think of at least two. Right. So you don't talk about insuring two insurers who are involved in the same dispute. That's a different scenario. I'm interested in why you think in this case there was a – this goes back to Judge Okuda's question. There would have been an incentive for a single attorney to favor a certain theory that might have inured to the benefit of the insurer and not to the insurer. Well, I'll be honest. That's a conflict you're interested in. Right. So I'll give you at least two examples, I think. So one is, you know, so they're both plaintiffs and defendants. They're both basically seeking damages from each other, and not just like an NBL seeking an apportionment of who's responsible. They're affirmatively seeking damages. So the city, as a landowner, is saying, you have to pay remediation costs to me. And L.A. Terminals is saying, we have response costs, investigation costs, all kinds of things that they're seeking as damages from the city. So both sides are seeking damages against each other. Obviously, the insurer in that situation has an incentive to diminish damages on both sides. It wants to have lower – you know, it wants to show that, you know, L.A.T. didn't actually have that many response costs. It wants to show that the damage caused to the city wasn't actually that high because it's going to lose money if those damages amounts are high. Because it would have to flip the bill either way. Exactly. And then a second one here I think is even more clear in this situation because you have a bunch of third-party defendants. So, you know, it might well be the case that the strongest thing for L.A.T. is to say the city did it. The city is the big police. And that's the most compelling theory and the most likely to get L.A.T. off the hook. But that theory is a problem for the insurer because if that theory prevails, then the city is going to have to pay. And the insurer is insuring the city, so they don't want that. So instead, they might direct a theory towards one of the other third-party defendants even though the case against them is much weaker and L.A.T. might end up recovering less in that situation. So those are just two very obvious conflicts of interest that can arise when you do something remarkable like, you know, insure both sides. There is no case where I've seen an insurer even try to do this. The case listed on this, because it's a remarkable thing to try to even attempt. But the leading insurance treatise in California says there's a large block of authority recognizing that this is a relatively obvious proposition that an insurer can't insure both sides of the V. And it's consistent with the pronouncements in O'Mara rule this comes from that it is contrary to public policy for a person to control both sides of litigation and quote, a full and fair examination of the merits of a case cannot be had when one person controls counsel for both sides. So it's just the most fundamental conflict imaginable. And of course, when, you know, they arrived and said, oh yeah, we're going to now foot the bill, but we're actually also defending, we're also insuring the other side, we said, that's absolutely unacceptable. And we've already got our counsel, which we have a significant reliance, interest in keeping our counsel. And the only reason we have that counsel is because you refused to defend us from the beginning. So that's another alternative ground, which is the full-fledged ground. But I think the most straightforward ground is just the conflict that arises from insuring both sides of the V. I'm happy to talk about the other two grounds if there are questions on those. I'm happy to talk about damages or injunctive relief if the court has questions on either of those. Well, you have quite a bit of time left, so maybe I'll ask about that. There's a – the last issue that Post and Counsel chose not to address, and an opportunity when it comes back, is the right to a jury trial. They're claiming the right to a jury trial now. And on the one hand, I'm distracted because United's position in the district court was a very strong objection that the board of the antitrust tantamount to a permanent mandatory injunction or directive for specific performance. So it was, you know, sort of quintessentially the language of equity. But I'm not suggesting that's binding in any way. It's just that we're dealing with this odd animal. And the right to a jury trial is, of course, very important. So I'm trying to figure out the nature of the relief sought here and whether it is indeed equitable or illegal. You've read the briefing on this. So do you want to – Yeah, absolutely. – have your client's take on this? Right. And I think it is honestly a tricky question. We've looked at the cases. There's not very many cases that deal with this exact issue. And the exact issue is when you have a situation like this where there's an ongoing underlying litigation and you have the insurance action. And the insurance action's primary purpose is to basically bring the insurer in and get them to fulfill their duty to defend what is a current and ongoing litigation. I think the other side would at least accept that in that situation, the forward-looking relief that the publish says you have to pay all lawyers' fees tomorrow, that is injunctive relief. I think what they might be suggesting is the backward-looking component is damages. And I think that's a very odd way to splice it up because in a situation like this, whether you have a bill from the lawyer that's for yesterday's work or a bill for the lawyer that's tomorrow doesn't really make a huge difference. I'm sure it doesn't. So let's see if you can slow down a little bit. So if we're in federal court, which we were, and we're looking to vindicate the Seventh Amendment right, I think it's very clear because of the authorities relied upon by the district court and you both discussed them at the briefing, American Motorists. We know how the state court would treat this, right? But in federal court, I'm struggling to figure out exactly what the right answer is because I think it's very important that it was the interlocutory, right? And so the judge had ordered, I think very clearly had ordered United that it needed to pay. But as you say, we're a year in, but by the time that hearing took place, so there was an arrearage that had been quantified. Right, exactly. And so, and then there was a duty, the court thought, to pay ongoing lest the insurer be left twisting in the wind and finding, seeing its own defense in the interim. Have you seen any case law where that has been subdivided and dealt with in that way? Well, we've not seen any. So in fact, why they wouldn't have a right to a jury trial for the arrearage. It seems to me that's clearly an injunctive component going forward. Right, and I think the question is, you know, does it qualify as incidental intertwined with the injunctive relief, basically, and it's similar to how it passed HEC. And the only other- What would be the closest authority on that? I mean, I think that, well, so there's a case that's, they cite the J.R. Simpler case, which is just a much more clear damages situation because that's, the underlying litigation is over. If the underlying litigation is over, it's damages. There's no doubt about that. The question is, when the litigation is ongoing and you're dragging the insurer in, and then that case cites this Westar Energy v. Lake case from the 10th Circuit. It's a 552F3215. And that case basically seems to treat, as in, it's really dealing with the question of whether there's a appellate jurisdiction for preliminary injunction, but it does treat the forward-looking and the backward-looking component as both parts of injunctive relief under the sort of rational way describing, which is that, you know, when you have a lawyer that's saying, I've got some bills due, and I also have got to defend you in the future. And what the insurer should have been doing is defending the whole way through. They can't just come in and pay tomorrow's bills, let those bills due go, because, you know, that's not really fulfilling a duty to defend. The lawyer might say, I'm going to leave this litigation and leave you in the wind because you're not paying the bills that were due yesterday, too. So part of assuming a defense is not just paying bills going forward. It's paying the past bills. This wasn't litigated in the district court or briefed on appeal, really. You know, in the district court, my understanding is that there was this hearing where there was going to be a question about quantifying the rearage, and I think opposing counsel's position was caught off guard a little bit about what he thought he was there for. And then an offer to request for a jury trial, an offer to forego that if they could be sent to mediation. They weren't sent to mediation. And then quite a pronounced objection that what the court was doing was granting injunctive relief. I think that had to do with the entire order. I don't think it was subdivided as I have indicated. But do I have that right, or is that correct? I'm misunderstanding the record on this. That's my understanding, as well, of the record. I mean, opposing counsel might have a different understanding. But my understanding is they did characterize this as injunctive relief, and I think that the district court understood it as injunctive relief. Well, in part, I think it certainly was, but it does seem to me that the district court – this wasn't teed up for the district court in the way that it is now on appeal, so I'm just trying to get my arms around the best way to look at it. It sounds like you think this is the closest case, the one you just referred to. I think that's the closest case that seems to treat the backward-looking component of the – and we cite a couple other cases in our brief, one from the District of D.C., but that's certainly the closest court of appeals case. I mean, it's an unusual situation. I think it is fair, Your Honor, to say that this is not exactly how it looked or that this was not fully vetted. These are not new arguments, but these are definitely arguments that we're making that I think explain the rationale in more detail. So at the time of this order being entered, I do think that's important. At the time of the order being entered, the underlying suit was still going. There was, indeed, a settlement announced, much less consummated, right? Yes. Let me just get this right. Yes, notice of action came about six months later. The bad faith claim hadn't settled yet either. I don't think anything in the litigation does mind. The bad faith claim didn't settle until May of 2022. This order was issued in September of 2020, so that sort of helps me understand the position the parties were in at the time. Right. And all of this was happening in the backdrop of, you know, this was a lawsuit that we filed in January 2019, trying to get the insurer to come in and pay up of these. Our client has gone into bankruptcy, you know, in part as a result of these sorts of litigations. And it is now 2025. Not one dollar is being paid. You know, there are multiple orders. There was a motion to dismiss order that found, you know, that effectively it was a duty to defend. There was a motion to summon a judgment order that found this a duty to defend. And the typical procedure in California law is that once that court has kind of made that judicial determination, you know, that at least shows the possibility of coverage. You start defending, and then you seek a recoupment action. They just steadfastly refuse to do any of that. Even though there was a pending badge-based claim at that point.  And so, you know, I guess I sort of think that that – I think the district court's order reflects that frustration a little bit, where it sort of says this is partly as injunctive relief, I believe, to effectuate the fact that at the moment you're not complying with orders. And so what it is is we're going to drag you into litigation, and we're not going to let you say, well, I'm going to pay the future cost, but I'm not going to pay the past cost, and let's have a long jury trial about that by the time, you know, that's over, obviously, you know. When the judge entered the order, he recognized there may be a dispute about the reasonableness of fees, and there was a dispute about the reasonableness of fees. So what is your position about how that ought to be vindicated? Well, I mean, under California law, when it did ensure breaches, you defend the fees of presumptively reasonable, and the dispute really was late-breaking. I mean, throughout, they didn't really dispute them as they were ongoing. It was only in this sort of summary judgment and damages phase where they said, we now have a dispute. So, you know, but I think that the court is allowed to adjudicate, as a matter of record of relief, whether they were reasonable, and that's kind of what he did here. He sort of said they were presumptively reasonable because of the fact that you'd be in position to judge whether or not it's equitable. I fully agree with everything Johnson, whether it's equitable. If it's damages, then it has to go back to a jury trial, but I think it's a hard question. I don't think there's a lot of law in it, but I do think that it would be, I think, very unusual to sort of split up something which is such, so clearly an adjunct to the prospective relief. It's saying, basically, pay yesterday's fees as well as tomorrow's, and I do think that falls within, you know, the two tests that this court has identified. You know, one is an attempt to give plaintiff what he is entitled, as opposed to a substitute for a consequential loss. This is not a substitute. We're saying, pay that bill. You know, it's what we're entitled. We were entitled to you being with us from the beginning, paying the bills as they were going forward, and then, you know, the test from there is incidental to or intertwined with the adjunctive relief. So, we think it meets the legal tests. You know, there's not a plain case. This court is going to have to sort of figure that out in the first instance. Thank you. Thank you, Your Honor. We'll give you a minute for rebuttal. Thank you, Your Honors. Just one minute is all I have. Let me just hit Oboro very quickly. What counsel said about Oboro is not correct. Oboro found that where two insurers each had a duty to blow the defense, because if they blew the defense of a policyholder suing each other, each policyholder would not be able to recover anything under the old contributory negligence rule. What we're talking about here is effectively the same as what goes on virtually every day in litigation in California state courts and the federal courts, frankly. There is no third-party plaintiff in the sense that the federal government nor the state government agencies did not file a suit. They simply issued orders to which L.A. Terminals and other participants in the pollution had to respond. So, the complaints we're talking about here are essentially the equivalent of cross-complaints for indemnity and damages and the sorts of things you get in any big construction case or any other sort of big case where there's a lot of parties who have been brought to heel. This is not an original case where people had original damages. The situation here is identical to those other cases, which is why the court in the MDL decision, the California state court, found that it was perfectly fine for disparate defendants, even ones who are suing each other, to be defended by appointed insurer counsel where the insurer counsel had separated the law. He also talks about not allowing the opportunity to see the other claims file. And in this instance, the senior litigation attorney sent the report, the city's report, to the claims file. She did, and it was mistakenly included. She said, I sent it there so you could get a look. We got the email. Yeah, she made a mistake. It wasn't any administrative error. It wasn't clerical error. The senior environmental attorney who sent it said, I sent it so that you could get a look and see what's going on here. So the standard we have under the case law that I think that you're referring to, sir, and I appreciate it was a mistake. I'm not a contributing ill intent, but it is what it is in the record that we have. And the case law standard is whether or not they allowed access, if not allowed access. Which is not entirely true, Your Honor. That's the word that's used. It's used in one of the, if you look closely at the MPL case, there was even one insurer that had a single adjuster supervising the defense, and two defendants, and the court found that to be okay. That said, United National went beyond that, and the access that we're referring to here was corrected. Yes, it was an error. No one disputes that it was an error. It's been called an error throughout. We soften it up by calling it an administrative error, but it was perhaps poor judgment. Regardless of whether it was poor judgment, the assigned adjuster recognized the error immediately, pointed it out, said she was not going to read it, clarified that it should not be there, and confirmed that she deleted it. That's all in the record that the Applebee's submitted. You're over time. Thank you. Thank you, Your Honor. Okay. The case of United National Insurance Company v. L.A. Terminals and Zocopeth is submitted.
judges: IKUTA, CHRISTEN, Liburdi